**Bilal Ali SALAM, Appellant,**

v.

**A.L. LOCKHART, Director, Arkansas Department of Correction, Appellee.**

No. 88–1689.

United States Court of Appeals, Eighth Circuit.

Submitted Jan. 11, 1989.

Decided May 8, 1989.

Rehearing Denied June 2, 1989.

David A. Hodges, Little Rock, Ark., for appellant.

William F. Knight, Asst. Atty. Gen., Little Rock, Ark., for appellee.

Before MAGILL, Circuit Judge, and HEANEY, Senior Circuit Judge, and BEAM, Circuit Judge.

BEAM, Circuit Judge.

Bilal Ali Salam, formerly known as Kevin Robinson, appeals from the district court's [1] denial of his petition for habeas corpus relief from two separate convictions. The district court ordered the State of Arkansas to allow a belated appeal from the third conviction. We affirm.

## I. BACKGROUND

On November 9, 1980, Lisa Nichols, a nine-year-old girl, was approached by a black male who requested that Lisa accompany him to a place where he would give her puppies. Lisa followed the man to a garage where she was raped. Lisa told the police that she had seen her attacker before on the school campus and that several of her friends were with her when she saw the assailant.

On December 5, 1980, Latrice Williams, Karen Brewer, Sharon Glenn, Dionne Dantzler, and Latonya Kitchens were walking to their elementary school when they were approached by a black male who asked them if they would go with him into the woods to put some puppies in a bag. He informed the girls that his cousin Tora attended the same school as they did. Dionne and Latonya, both of whom were nine years of age, followed the man to the woods where he raped Dionne and attempted to rape Latonya. The two girls described the assailant as retarded. The two girls reported the attack, and investigators determined that the "Tora" was Tora Davis and that she had a male cousin named Carlton Johnson who had a history of mental illness. Johnson was taken into custody and placed in a physical lineup, but none of the victims could identify him.

---

1. The Honorable G. Thomas Eisele, Chief Judge, United States District Court for the Eastern District of Arkansas.

On the morning of December 8, 1980, Cassandra Sykes, an eight-year-old girl who was walking to school, was asked by a black male to help him get some puppies out of the woods. When Cassandra accompanied the man into the woods, he attempted to rape her.

Based on a statement taken from a friend of the first victim, on December 10, 1980, Salam was taken in for questioning, photographed, and released. On December 11, 1980, the victims and witnesses were shown photographic spreads which included Salam's photograph. Due to the positive identification of Salam as the assailant from the photographic display, on December 22, 1980, Salam was arrested and placed in a lineup where he was identified as the perpetrator of the crimes.

Three separate jury trials were held. Salam was represented by attorneys from the public defender's office at each trial. Salam was convicted on July 2, 1981, for the rape of Dionne Dantzler and attempted rape of Latonya Kitchens; on October 19, 1981, for the rape of Lisa Nichols; and on November 19, 1981, for the attempted rape of Cassandra Sykes. Salam received consecutive sentences of fifty, twenty, twenty-five, and twenty-five years as a result of these convictions.

After exhausting his state remedies, Salam sought and was denied federal habeas corpus relief in the district court. This appeal followed. Salam alleges that he was denied effective assistance of counsel due to a conflict of interest, that he was denied due process because of improper identification procedures, and that prosecutorial misconduct violated due process. Salam has raised a number of other grounds for reversal which we do not address in detail.

## II.  DISCUSSION

### A.  Conflict of Interest

■ As indicated, Carlton Johnson was taken into custody as a suspect early in the investigation because the assailant stated that he had a cousin named Tora and appeared retarded. Johnson fit this description. As also indicated, Johnson was placed in a lineup, and none of the witnesses or victims identified him as the assailant. While in custody, Johnson was represented at his bond hearing by Sandra Berry, an attorney from the public defender's office. The public defender's office had also represented Johnson on earlier, unrelated charges. Because none of the victims or witnesses identified Johnson, he was released, and the public defender's office no longer represented him after that time.

Salam contends that a conflict of interest existed which deprived him of his sixth amendment right to effective assistance of counsel. In support of this contention, Salam points to the public defender office's prior representation of Johnson on the very same charges leveled against Salam. Salam argues that due to this conflict of interest, his counsel failed to present evidence in the first trial [2] which would have indicated that Johnson was the perpetrator of the crime.

"Conflicts may arise when an attorney simultaneously represents clients with differing interests (multiple representation), or when an attorney representing a defendant has previously represented codefendants or trial witnesses (successive representation)." *United States v. Shepard,* 675 F.2d 977, 979 (8th Cir.1982). "Generally, it is more difficult to show an actual conflict resulting from successive rather than simultaneous representation." *Mannhalt v. Reed,* 847 F.2d 576, 580 (9th Cir.) (citation omitted), *cert. denied,* — U.S. ——, 109 S.Ct. 260, 102 L.Ed.2d 249 (1988). In order to prevail, a defendant must show that "an actual conflict of interest adversely affected his lawyer's performance." *Cuyler v. Sullivan,* 446 U.S. 335, 348, 100 S.Ct. 1708, 1718, 64 L.Ed.2d 333 (1980) (footnote omitted). A defendant is not entitled to relief under the *Cuyler* test unless he satisfies both prongs. *Lightbourne v.*

---

**2.** Although Salam contends that this conflict infected all three trials, we do not agree. Johnson was only a suspect in the first trial which involved the rape of Dionne Dantzler and Latonya Kitchens.

*Dugger,* 829 F.2d 1012, 1023 (11th Cir.1987) (citations omitted), *cert. denied,* —— U.S. ——, 109 S.Ct. 329, 102 L.Ed.2d 346 (1988). That is, once the defendant demonstrates the existence of an actual conflict, he must also show that the conflict had an adverse effect on his attorney's performance. *Id.* (citations omitted).

We assume without deciding that representation by one attorney in the public defender's office may be imputed to all attorneys in the office. However, we are not convinced that Salam has demonstrated an actual conflict. The representation of Johnson was minimal. Johnson was represented for one day at a bond hearing. Jim Phillips who, along with Kelly Carithers, represented Salam testified at the habeas corpus hearing that he did not feel any conflict of interest. "Courts generally give substantial weight to defense counsel's representations regarding conflicts of interest." *United States v. Agosto,* 675 F.2d 965, 972 (8th Cir.1982) (citations omitted). Assuming, for the sake of discussion, that Salam has demonstrated an actual conflict, after closely examining the record, we are persuaded that the conflict of interest did not have an adverse effect on Salam's attorneys' performance.

Although defense counsel did not personally interview Johnson before trial, Ernest McDaniel, the investigator for the public defender's office, spoke with him. McDaniel testified at the habeas corpus hearing that his investigation of Johnson was hampered by Johnson's incoherence. Through the examination of various witnesses, Salam's attorneys repeatedly brought out that Tora Davis attended the same school as the victims and witnesses, that Johnson was retarded or suffered from mental illness, and that Johnson was a suspect in the case. On redirect examination of Salam, Salam testified that he had no knowledge of Tora Davis. Defense counsel called Johnson as a witness and elicited from Johnson that he had been arrested and charged with the rape, had a cousin named Tora Davis, and was an outpatient at the State Hospital. Counsel's strategy was to demonstrate Johnson's resemblance to Salam and to allow the jury to view Johnson's

demeanor. Though defense counsel did not ask Johnson his whereabouts on the date of the attacks or other inculpatory questions, counsel was constrained due to Johnson's mental disability and a legitimate fear that Johnson might assert his fifth amendment privilege against self incrimination. During defense counsel's closing argument, counsel noted that Johnson matched the description of the assailant. Thus, we find that Salam has not satisfied either prong of the *Cuyler* test and, therefore, was not denied his sixth amendment right to effective assistance of counsel due to a conflict of interest.

**B. Improper Identification Procedures**

As indicated, the victims and witnesses were shown a photographic array which included Salam's picture and observed a corporeal lineup in which Salam appeared. At the pre-trial suppression hearing on the identification procedures, Latonya Kitchens, Lisa Nichols, and Latrice Williams testified that they identified Salam as the assailant from the photographic display, and Dionne Dantzler, Sharon Glenn, Latrice Williams, and Karen Brewer testified that they identified Salam as the assailant in the lineup. Although Latonya Kitchens' testimony was somewhat confusing on this point, the other victims and witnesses testified that the police did not attempt to influence their decision during the viewing of the photographic array or lineup. Salam argues that the identification procedures were impermissibly suggestive, violating his right to due process. Salam contends that the in-court identification testimony was tainted and should have been suppressed in each of the trials.

■ "The admissibility of identification evidence is determined using a two-step test. A court first must determine whether the confrontation between suspect and witness was impermissibly suggestive. If so, the court must ascertain under the totality of the circumstances whether the confrontation created a 'very substantial likelihood of irreparable misidentification.'" *Hulsey v. Sargent,* 821 F.2d 469, 473 (8th Cir.) (footnote omitted) (quoting *Manson v. Brathwaite,* 432 U.S. 98, 116, 97

S.Ct. 2243, 2253–54, 53 L.Ed.2d 140 (1977)), *cert. denied*, —— U.S. ——, 108 S.Ct. 299, 98 L.Ed.2d 258 (1987).

After carefully reviewing the papers submitted and the record, we find that the identification procedures were not impermissibly suggestive. The individuals in the photographic display and lineup were of the same race, possessed similar physical features, and were alike in size, age, and dress.

■ During oral argument, the issue was raised as to whether Carlton Johnson, the earlier suspect, should have been included in the same photographic display or lineup as Salam. We have found no cases which support this requirement. We see no reason for mandating such a procedure. The victims viewed a lineup in which Johnson appeared. Not one of the victims identified Johnson as the perpetrator of the crimes. Given these circumstances, we see little chance of misidentification.

C. Statements by the Prosecutor

■ During closing argument in the first trial, defense counsel informed the jury that no neutral representative accompanied the victims when they viewed the lineup. In the rebuttal portion of his closing argument, the prosecutor made the following statement:

> The defendant sought to say that there had been no neutral authority who has reviewed the actions of the police department, reviewed the line-ups, but there has been. And that's the authority of the Judge. Ladies and gentlemen, if there had been something wrong—if there had been a defect in the photo show-ups or the line-ups, they wouldn't be here before you. We had a pre-trial hearing on that. They're here before you because the Judge found no defects.

Defense counsel moved for a mistrial based on these comments. The judge denied his motion and, instead, admonished the jury. Salam argues that he was denied due process because the prosecutor's comments conveyed to the jury the idea that the question of the identity of the assailant had already been ascertained and was no longer an issue to be decided by the jury.

It is a fundamental principle that federal courts may intervene in state judicial processes only to correct constitutional wrongs. *Wycoff v. Nix*, 869 F.2d 1111, 1113 (8th Cir.1989). On prosecutorial misconduct claims, our review is limited to determining whether the prosecutor's actions were so egregious that they fatally infected the entire trial, rendering it fundamentally unfair and denying the defendant due process. *Darden v. Wainwright*, 477 U.S. 168, 181, 106 S.Ct. 2464, 2472, 91 L.Ed. 2d 144 (1986); *Donnelly v. DeChristoforo*, 416 U.S. 637, 643, 94 S.Ct. 1868, 1871, 40 L.Ed.2d 431 (1974).

We first note that the jury was properly admonished that the comments by counsel were not evidence in the case. Furthermore, the jury was instructed to consider only the evidence before them. Based on the evidence in the record as a whole, we do not believe that the prosecutor's statement "fatally infected the entire trial." Thus, we conclude that the prosecutor's remarks did not violate Salam's due process rights.

III. CONCLUSION

We have carefully reviewed all other issues raised by Salam and find them to be without merit. For the foregoing reasons, we affirm the judgment of the district court.